UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2015 FEB 26  P 1: 09

|  |  |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 3:13CR212(AVC) |
| v. | VIOLATION: |
| JUNJI KUSUNOKI, | 18 U.S.C. § 371 (Conspiracy) |
| REZA MOENAF, | 15 U.S.C. § 78dd-2 (Foreign Corrupt Practices Act) |
| and | 18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering) |
| EKO SULIANTO | 18 U.S.C. § 1956(a)(2)(A) (Money Laundering) |

SUPERSEDING INDICTMENT

The Grand Jury charges:

COUNT ONE
(Conspiracy)

At all times relevant, unless otherwise specified:

1.     The Foreign Corrupt Practices Act of 1977, as amended, Title 15, United States Code, Sections 78dd-1, *et seq.* ("FCPA"), was enacted by Congress for the purpose of, among other things, making it unlawful for certain classes of persons and entities to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value to a foreign government official for the purpose of assisting in obtaining or retaining business for, or directing business to, any person.

The Defendants, Their Co-Conspirators and the Relevant Contracts

2.     Alstom S.A. ("Alstom") was headquartered in France.   Alstom was in the business of providing services related to power generation and transportation around the world, including Indonesia.  Alstom had sales of approximately €17 billion annually and approximately

75,000 employees in over seventy countries.  Shares of Alstom's stock were listed on the New York Stock Exchange until August 2004.  Alstom had direct and indirect subsidiaries in various countries around the world, including a subsidiary in Connecticut known as Alstom Power, Inc. ("Alstom Power US"), a subsidiary in Indonesia known as PT Energy Systems Indonesia ("Alstom Indonesia"), and a subsidiary in Switzerland known as Alstom Network Schweiz AG, fka Alstom Prom AG ("Alstom Prom").  Alstom Power US was headquartered in Windsor, Connecticut, incorporated in Delaware, and thus a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(B).  Through its subsidiaries, including Alstom Power US, Alstom Indonesia, and Alstom Prom, Alstom bid on projects to secure contracts to perform power-related and transportation-related services, including for state-owned entities.

3.      Marubeni Corporation ("Marubeni") was a trading company headquartered in Japan that did business around the world, including Indonesia.  Marubeni and its subsidiaries and joint ventures had trading transactions of approximately $74 billion annually and approximately 24,000 employees in over 70 countries.  In conducting its business, Marubeni received assistance from its subsidiaries and joint ventures, including Marubeni Power Systems Corporation ("MPSC"), a wholly owned subsidiary of Marubeni that shared its offices with Marubeni and acted as an agent on Marubeni's behalf.  Marubeni maintained a bank account at the Bank of New York in New York.

4.      The Tarahan Project (sometimes referred to simply as "Tarahan"), was a project to provide power-related services to the citizens of Indonesia that was bid and contracted through Indonesia's state-owned and state-controlled electricity company, Perusahaan Listrik Negara ("PLN").  Tarahan was valued at approximately $118 million.  The Muara Tawar projects were a

2

series of projects to perform services related to, and to expand, the Muara Tawar power plant and provide power-related services to the citizens of Indonesia. One such project was the Muara Tawar Block 5 Project, valued at approximately $260 million. Collectively, the Muara Tawar projects were sometimes referred to as "Muara Tawar" or "MT." PLN was responsible for sourcing the Tarahan Project and Muara Tawar Projects.

5.      Alstom, through its subsidiaries, including Alstom Power US, Alstom Indonesia, and Alstom Prom, partnered with Marubeni to bid on and secure the Tarahan Project and Muara Tawar Block 5 Project. Marubeni, through its employees and agents, attended meetings with Alstom and Alstom Power US executives in Windsor, Connecticut, in connection with the Tarahan Project. Thus, Marubeni was a "person," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(1).

6.      The defendant, JUNJI KUSUNOKI ("KUSUNOKI"), held several positions at Marubeni, including Deputy General Manager of Marubeni's Overseas Power Project Department, General Manager of MPSC, and President of another Marubeni subsidiary. KUSUNOKI's responsibilities at Marubeni included obtaining contracts with new customers and retaining contracts with existing customers on behalf and for the benefit of Marubeni in various countries, including obtaining and retaining the contract for the Tarahan Project and Muara Tawar Projects in Indonesia. KUSUNOKI was one of the people responsible for retaining consultants on behalf of Marubeni, knowing that a portion of the payments to the consultants was intended for Indonesian officials in exchange for their influence and assistance in awarding the Tarahan Project and Muara Tawar contracts to Alstom, its subsidiaries, and Marubeni.

7.      The defendant, REZA MOENAF ("MOENAF"), was the President of Alstom Indonesia. MOENAF's responsibilities at Alstom Indonesia included assisting other Alstom

3

entities' efforts to obtain contracts with new customers and to retain contracts with existing customers in Indonesia, including assisting Alstom Power US to obtain projects in Indonesia. Thus, MOENAF was an agent of a "domestic concern," Alstom Power US, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).  MOENAF was one of the people responsible for retaining consultants in connection with Alstom and its subsidiaries' efforts to obtain and retain contracts in Indonesia, including for the Tarahan Project and Muara Tawar Projects, knowing that a portion of the payments to the consultants was intended for Indonesian officials in exchange for their influence and assistance in awarding the Tarahan Project and Muara Tawar Projects contracts to Alstom, its subsidiaries, and Marubeni.

8.      The defendant, EKO SULIANTO ("SULIANTO"), was the Director of Sales of Alstom Indonesia. SULIANTO's responsibilities at Alstom Indonesia included assisting other Alstom entities' efforts to obtain contracts with new customers and to retain contracts with existing customers in Indonesia, including assisting Alstom Power US to obtain projects in Indonesia.  Thus, SULIANTO was an agent of a "domestic concern," Alstom Power US, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).  SULIANTO was one of the people responsible for retaining consultants in connection with Alstom and its subsidiaries' efforts to obtain and retain contracts in Indonesia, including for the Tarahan Project and Muara Tawar Projects, knowing that a portion of the payments to the consultants was intended for Indonesian officials in exchange for their influence and assistance in awarding the Tarahan Project and Muara Tawar Projects contracts to Alstom, its subsidiaries, and Marubeni.

9.      Lawrence Hoskins ("Hoskins"), who has been charged separately, was an Alstom Senior Vice President for the Asia region in Alstom's International Network, which assisted Alstom's various power and transportation entities in obtaining contracts.    Hoskins'

4

responsibilities at Alstom included overseeing Alstom's subsidiaries' efforts to obtain contracts with new customers and to retain contracts with existing customers in Asia, including the Tarahan Project and Muara Tawar Projects contracts in Indonesia. Thus, Hoskins was an agent of a "domestic concern," Alstom Power US, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1). Hoskins was one of the people responsible for retaining consultants for the Tarahan Project and Muara Tawar Projects, knowing that a portion of the payments to the consultants was intended for Indonesian officials in exchange for their influence and assistance in awarding the Tarahan Project and Muara Tawar Projects contracts to Alstom, its subsidiaries, and Marubeni.

10.     Frederic Pierucci ("Pierucci"), who has been charged separately, held executive level positions at Alstom, including Vice President of Boiler Global Sales. Pierucci's responsibilities at Alstom Power US included oversight of Alstom Power US's efforts to obtain contracts with new customers and to retain contracts with existing customers around the world, including obtaining and retaining the contract for the Tarahan Project from PLN in Indonesia. Pierucci was one of the people responsible for approving the selection of, and authorizing payments to, consultants for the Tarahan Project, knowing that a portion of the payments to the consultants was intended for Indonesian officials in exchange for their influence and assistance in awarding the Tarahan Project contract to Alstom, its subsidiaries, and Marubeni.

11.     William Pomponi ("Pomponi"), who has been charged separately, was a Vice President of Regional Sales at Alstom Power US. Pomponi's responsibilities at Alstom Power US included obtaining contracts with new customers and retaining contracts with existing customers in various countries, including obtaining and retaining the contract for the Tarahan Project in Indonesia. Pomponi was one of the people responsible for approving the actions of,

and authorizing payments to, consultants for the Tarahan Project, knowing that a portion of the payments to the consultants was intended for Indonesian officials in exchange for their influence and assistance in awarding the Tarahan Project contract to Alstom, its subsidiaries, and Marubeni.

12.    David Rothschild ("Rothschild"), who has been charged separately, was a Vice President of Regional Sales at Alstom Power US.  Rothschild's responsibilities at Alstom Power US included obtaining contracts with new customers and retaining contracts with existing customers in various countries, including obtaining the contract for the Tarahan Project from PLN in Indonesia.  Rothschild was one of the people responsible for approving the actions of, and authorizing payments to, consultants for the Tarahan Project, knowing that a portion of the payments to the consultants was intended for Indonesian officials in exchange for their influence and assistance in awarding the Tarahan Project contract to Alstom, its subsidiaries, and Marubeni.

13.    "Alstom Employee A," an individual whose identity is known to the Grand Jury, worked in Alstom's Global Power Sales unit, which was responsible for business development of Alstom's various power business units.  Alstom Employee A held various executive level positions within Alstom, including a high level executive position at Alstom Indonesia.

14.    "Consultant A," an individual whose identity is known to the Grand Jury, was a consultant who purportedly provided legitimate services on behalf of Alstom, its subsidiaries, and Marubeni in connection with the bidding of the Tarahan Project in Indonesia.  In reality, Consultant A was retained for the purpose of paying bribes to Indonesian government officials, including Official 1 and Official 2, described more fully below.

15.    "Consultant B," an individual whose identity is known to the Grand Jury, was a consultant who purportedly provided legitimate services on behalf of Alstom, its subsidiaries, and Marubeni in connection with the bidding of the Tarahan Project and Muara Tawar Projects in Indonesia. In reality, Consultant B was retained for the purpose of paying bribes to officials at PLN, including Official 2 and Official 3, described more fully below.

<u>The Foreign Officials</u>

16.    PLN, the state owned and controlled electricity company in Indonesia, was an "agency" and "instrumentality" of a foreign government, as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2) and 78dd-3(f)(2).

17.    "Official 1," an individual whose identity is known to the Grand Jury, was a Member of Parliament in Indonesia and had influence over the award of contracts by PLN, including on the Tarahan Project and Muara Tawar Projects.

18.    "Official 2," an individual whose identity is known to the Grand Jury, was a high-ranking official at PLN and had broad decision-making authority and influence over the award of contracts by PLN, including on the Tarahan Project and Muara Tawar Projects.

19.    "Official 3," an individual whose identity is known to the Grand Jury, was an official at PLN and a high-ranking member of the evaluation committee for the Tarahan Project and Muara Tawar Projects. Official 3 had broad decision-making authority and influence over the award of the Tarahan Project and Muara Tawar Projects.

20.    "Official 4," an individual whose identity is known to the Grand Jury, was an official at PLN and a member of the evaluation committee for the Tarahan Project and Muara Tawar Projects. Official 4 had the ability to influence the award of the Tarahan Project and Muara Tawar Projects.

21.     Official 1, Official 2, Official 3, and Official 4 were each a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2) and 78dd-3(f)(2).

Overview of the Bribery Scheme

22.     Between 2002 and 2009, Alstom, its subsidiaries, and Marubeni (the "Consortium") partnered to bid on and carry out various power projects in Indonesia through PLN, including the Tarahan Project and the Muara Tawar Projects.  The Consortium retained several consultants, including Consultant A and Consultant B, to assist them in obtaining the contracts for the power projects in Indonesia, including the Tarahan Project and Muara Tawar Projects.  The consultants' primary purpose was not to provide legitimate consulting services to the Consortium but was instead to pay bribes to Indonesian officials who had the ability to influence the award of the contracts.

23.     The Consortium first retained Consultant A in connection with the Tarahan Project in or around late 2002.  Consultant A was to receive a commission from the Consortium based on the overall value that each would receive from the Tarahan Project contract, from which Consultant A was expected to pay bribes to Indonesian officials.  However, through the course of 2003, MOENAF, SULIANTO, KUSUNOKI, and other executives and employees of the Consortium came to the conclusion that Consultant A was not effectively bribing key Indonesian officials.   Accordingly, in or around September or October 2003, MOENAF, SULIANTO, KUSUNOKI, and other executives and employees of the Consortium informed Consultant A that Consultant A would be responsible only for paying bribes to Official 1 and that the Consortium would retain another consultant to pay bribes to PLN officials.  Shortly thereafter, the Consortium sent Consultant A amended consulting agreements, reducing the

8

amount of Consultant A's commission to reflect Consultant A's reduced responsibilities. Around the same time, the Consortium also retained Consultant B to bribe PLN officials in connection with their efforts to secure the Tarahan Project contract and the Muara Tawar Projects contracts.

24.     The Consortium was ultimately awarded the Tarahan Project and Muara Tawar Project contracts and made payments to Consultants A and B for the purpose of paying Indonesian government officials, including Official 1, Official 2, Official 3, and Official 4, in exchange for their assistance in awarding the Tarahan Project and the Muara Tawar Projects contracts to the Consortium.

<u>The Conspiracy</u>

25.     From in or around 2002, and continuing through in or around 2009, in the District of Connecticut, and elsewhere, KUSUNOKI, MOENAF, and SULIANTO did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly conspire, confederate and agree together and with each other, and with others known and unknown to the Grand Jury, to commit offenses against the United States, that is:

a.     together with domestic concerns and officers, directors, employees, and agents of domestic concerns, and with others known and unknown to the Grand Jury, to willfully make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do

9

and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist the domestic concerns in obtaining and retaining business for and with, and directing business to, the Consortium and others, in violation of Title 15, United States Code, Section 78dd-2(a); and

      b.      with others known and unknown to the Grand Jury, while in the territory of the United States, willfully and corruptly to make use of the mails and means and instrumentalities of interstate commerce and to do any other act in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist KUSUNOKI, MOENAF, SULIANTO, and the Consortium and others in obtaining and retaining business for and with, and directing business to, Consortium and others, in violation of Title 15, United States Code, Section 78dd-3(a).

## Purpose of the Conspiracy

      26.     The purpose of the conspiracy was to make corrupt payments to a Member of Parliament in Indonesia, officials at PLN, and other Indonesian officials in order to obtain and

retain contracts to perform power-related services for PLN, including the Tarahan Project and the Muara Tawar Projects contracts.

Manner and Means of the Conspiracy

27.     The manner and means by which KUSUNOKI, MOENAF, SULIANTO, and their co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following, while in the District of Connecticut and elsewhere:

28.     KUSUNOKI, MOENAF, and SULIANTO, together with other co-conspirators, discussed in person, via telephone, and via electronic mail ("e-mail") the need to obtain the contracts to perform power-related services on the Tarahan Project and Muara Tawar Projects.

29.     KUSUNOKI, MOENAF, and SULIANTO, together with other co-conspirators, discussed in person, via telephone, and via e-mail making bribe payments to government officials in Indonesia, including Official 1, Official 2, Official 3, and Official 4, among others, in order to obtain the Tarahan Project and Muara Tawar Projects contracts.

30.     KUSUNOKI, MOENAF, and SULIANTO, together with other co-conspirators, offered to pay, promised to pay, and authorized the payment of bribes, directly and indirectly, to and for the benefit of government officials in Indonesia, including Official 1, Official 2, Official 3, and Official 4, among others, in order to obtain the Tarahan Project and Muara Tawar Projects contracts.

31.     KUSUNOKI, MOENAF, and SULIANTO, together with other co-conspirators, discussed in person, via telephone, and via e-mail the manner and means by which the bribe payments were to be paid.

11

32.    KUSUNOKI, MOENAF, and SULIANTO, together with other co-conspirators, retained consultants in order to conceal and disguise the payments to foreign officials, including Official 1, Official 2, Official 3, and Official 4, among others.

33.    KUSUNOKI, MOENAF, and SULIANTO, together with other co-conspirators, caused bribe payments to be wired from the bank accounts of Alstom Power US, Alstom Prom, and Marubeni to the bank accounts of Consultant A and Consultant B for the purpose of making payments to foreign officials, including Official 1, Official 2, Official 3, and Official 4, among others, in exchange for the officials' assistance in securing the Tarahan Project and Muara Tawar Projects contracts.

Overt Acts

34.    In furtherance of the conspiracy and to achieve the objects thereof, at least one of the co-conspirators committed or caused to be committed, in the District of Connecticut and elsewhere, at least one of the following overt acts, among others:[1]

*Obtaining and Retaining the Tarahan Project and Muara Tawar Projects Contracts*

35.    On or about February 27, 2002, SULIANTO sent an e-mail to Rothschild, stating, "Approaching [Official 1] still in the stages to motivate him be in our loop, if he was able to meet [Official 2] last week end just matter of introducing of himself that he will be as our sponsor.  We will identify when he will be seriously to meet [Official 2] to specific discussion for Tarahan, before it happen we should provide him more detail info regarding [a competitor of Power Company]."

36.    On or about June 14, 2002, Rothschild sent an e-mail to SULIANTO, copying MOENAF, with the subject line reading the first name of Official 1, and stating, "Pls start the

---

[1] All quotations are as drafted.

paper work for using [Official 1's] representative company to assist in the BD [business development] effort.  If you need help with this let me know soon."

37.     On or about August 8, 2002, SULIANTO sent an e-mail to Rothschild, to which he attached a document explaining, among other things, that Official 1 was a "[k]ey legislator" and "Vice chairman of [the] Parliament commission 8 dedicated for Power & Energy" who had "[e]asy direct access personally to PLN Board" and who could exert "direct influence to PLN ([Official 2] and [another official])" and "utiliz[e] his comission 8 forum to influence PLN Board" and Ministries.

38.     On or about August 22, 2002, MOENAF sent an e-mail to Hoskins, Pierucci, and Rothschild, stating, "Referring to our discussion of 8-August-2002, it is now 2 weeks away from the tender submission date.  Your position concerning the representation is urgently needed. Currently, we are working with [Official 2] and [Official 3] in PLN on our 'competition', nevertheless, we would need a stronger push now.  Appreciate your decision a.s.a.p."

39.     On or about August 26, 2002, Rothschild sent an e-mail to KUSUNOKI discussing that Pomponi would be replacing Rothschild on the Tarahan Project, in which Rothschild stated, "Please rest assured that Alstom still considers this project most important and is pursuing it most aggressively....I have brefed [Pomponi] on the specific Tarahan issues, the bidding history, arrangement with Marubeni and [Alstom Indonesia], and also the arrangement with [Official 1].  Please feel confident in discussing these with Bill [Pomponi]."

40.     On or about August 28, 2002, Pierucci responded to the e-mail from MOENAF referenced in Paragraph 38 above, and stated, "Please go ahead and finalise the consultancy agreement.  Please send me the key data so that I can approve it officially."

41.     On or about August 28, 2002, Rothschild sent an e-mail to MOENAF, SULIANTO, Pierucci, and Pomponi, in response to Pierucci's e-mail referenced in Paragraph 40 above, and stated, "Regarding [Pierucci's] below message, Pls do not finalize anything yet with the Rep.  I spoke with Fred [Pierucci] right after he sent the note and we have concerns about 1) politician vs. businessman, 2) upfront expenses, 3) right person vs. another choice.  Part of this comes from discussions from Marubeni….We would like to discuss with you on Friday evening Jkt time."

42.     On or about September 4, 2002, MOENAF sent an e-mail to Rothschild, copying Pierucci, in which MOENAF stated, "[W]e have met [Official 1] to confirm whether he is comfortable with your suggested approach on Representation issue (through [Consultant A])….Again, from my point of view whichever approach taken on the Representation issue, must assure the coverage of Palembang [the city in Indonesia where the evaluation committee was located].  You need to be confident that [Consultant A] could do this since he – being the one who can make the 'commitment' – will have to take over the lead role from us in Palembang."

43.     In or around late 2002, the Consortium retained Consultant A, agreeing to pay Consultant A three percent of the Tarahan Project contract value as a commission.

44.     On or about December 3, 2002, MOENAF sent an e-mail to Hoskins discussing one of the Muara Tawar Projects, including whether to retain Consultant A in connection with that Muara Tawar Project, stating, "[Official 1] is a member of INDONESIA Parliament, precisely he is the Vice Chairman of Commission VIII, a commission in charge of handling Power issues….Besides his function in the Parliament, he has long well established relationship with [Official 2] (PLN President Director).  As a Vice Chairman of Commission VIII he

14

certainly have an influence in PLN.  He is not an agent but one of the players....[L]ooking in to [Consultant A's] performance in Tarahan, we need to think twice prior taking him into consideration....As the [Tarahan] project proceed, it shown that [Consultant A] has been unable to fulfil his tasks and our expectation, he has no grip on PLN Tender team at all.  Basically, his function is more or less similar to cashier which I feel we pay too much....As you know, I have set an appointment to meet [Official 2] tomorrow morning to find out who would be his recommended agent, the one that PLN can really feel comfortable with."

45.    On or about December 3, 2002, Hoskins sent an e-mail to an executive at Alstom, stating, "Will call you after I get feedback from Reza [MOENAF] on his meeting tomorrow with [Official 2].  At this stage Reza [MOENAF] does not support appointment of [Consultant A] for MT [Muara Tawar] but believes [Official 1] to be an important part of the jigsaw."

46.    On or about December 4, 2002, Hoskins forwarded to MOENAF the e-mail described in Paragraph 45 above, stating, "As discussed."

47.    On or about January 3, 2003, an executive at Alstom Prom sent an e-mail to Hoskins, copying another Alstom Prom employee, regarding the approval of the consultancy agreement with Consultant A, stating, "[Consultant A] sent me the completed 'Agent Profile' for his very small company in Baltimore, Maryland, with branch office in Washington....I understand, that the Tarahan job is boiler supply from the US to Indonesia.  As I said before, it would make more sens[e] to have an agent in Indonesia, where [Consultant A's] company has obviously an office.  As you know, we do not like to have a US domiciliated company as a consultant, with payment in the US, and most probably in USD."

48.    On or about January 15, 2003, Hoskins responded to the e-mail referenced in Paragraph 47 above, stating, "I talked to Reza [MOENAF] and his financial controller [] on this

subject to establish whether they could implement an agreement locally in Indonesia.  They were uneasy about dealing with a local company but thought an arrangement with Singapore may work.  Reza is going to check with [Consultant A] to see if he has a company in Singapore."

49.     On or about June 5, 2003, Alstom Employee A sent an e-mail to SULIANTO regarding one of the Muara Tawar Projects and discussing various agents that Alstom could retain in connection with the project, stating, "[Consultant B] basically works for [Official 2]."

50.     On or about August 12, 2003, Consultant A sent an e-mail to Pierucci about another upcoming power project with PLN (Labuan Angin), stating, "PLN people are upset with us that we told them we only need marginal support from them and now putting everything on them.  They are comparing the success fee for Tarahan and Labuan Angin and asking why they are so much different."

51.     On or about September 11, 2003, Alstom Employee A sent an e-mail to KUSUNOKI, copying SULIANTO, regarding one of the Muara Tawar Projects with the subject "Client Mapping," and stating, "Attached is some analysis as we spoke about last week….Please delete Email after you print."  The e-mail attached a spreadsheet titled, "Friend Analysis," which listed various government officials and the connections that Consultant B and another consultant had to those officials, including that Consultant B had the "Bank account for [a high-level executive in the Minister of Mines and Energy]."

52.     On or about September 16, 2003, KUSUNOKI sent an e-mail to Pierucci and Pomponi, copying MOENAF, SULIANTO, and other employees of Marubeni and Alstom Power US, stating that the PLN evaluation team had provided negative feedback on the Tarahan Project and that, "Yesterday, before Mr. Pomponi's leaving, we had wrap up meeting among [Alstom Power US, Alstom Indonesia, Marubeni] and our agent.  Most of attendee except [Marubeni],

16

had considered the current movements are under well controllable.  There was no actual clear evidence to prove our advantageous or our controllable situation at all."

53.     On or about September 16, 2003, Pierucci forwarded the e-mail referenced in Paragraph 52 above to Pomponi and Consultant A, copying MOENAF, SULIANTO, and other employees of Alstom, and stated, "When we spoke on Friday, you both told me that everything was under control in the evaluation . . . . Now, if the infos below are correct, we are not only evaluated number 2 but by a huge margin (almost $40M!!!!!!!!!!!!!!!!)  HOW CAN THAT BE?? I thought we were controlling what was happening in Palembang??????  Please check asap if teh below infos are correct and give me by tomorrow a plan to recover this.  WE CAN NOT LOOSE THIS PROJECT!"

54.     On or about September 18, 2003, MOENAF forwarded an e-mail to Hoskins describing a meeting between two Alstom employees, two Marubeni employees, and two PLN officials, including Official 4, regarding the Tarahan Project that stated, "PLN has expressed their concerns over our 'agent'.  They did not like the approach made by the agent.  <u>More importantly, they concern whether they can trust on the agent or not in regards to 'rewards' issue.</u> They concern that if we have won the job, whether their rewards will still be satisfactory or this agent only give them pocket money and disappear.  Nothing has been shown by the agent that the agent is willing to spend money." (Emphasis in original).

55.     On or about September 19, 2003, KUSUNOKI sent an e-mail to Alstom Employee A regarding the Tarahan Project and one of the Muara Tawar Projects, stating, "According to Mr. Reza [MOENAF], [Official 2] is upset about two things relating to my yesterday's visit (Marubeni/Alstom matter)....I am very clear that we are now required by [Official 2] to select [Consultant B] as sole agent of [the Muara Tawar Project]."

56.     On or about September 19, 2003, Alstom Employee A forwarded to Hoskins the e-mail referenced in Paragraph 55 above, stating, "Interesting reading below. [Official 2] seems to had made a clear choice and that is that we have to go with [Consultant B]."

57.     On or about September 25, 2003, an Alstom employee sent an e-mail to Pierucci and Pomponi, copying Hoskins and blind copying MOENAF, stating, "Last evening 9/24/03, Marubeni's [two Marubeni employees] and J. Kusunoki asked to alert with Alstom's R. Moenaf, E. Sulianto & [an Alstom Power US employee].  The subject of discussion was the increasingly negative direction of the [Tarahan] project's evaluation and report to PLN board of Dirctors…coupled with the recent information that the key ([Official 2]) to the project's success is not pleased with our agent's commitment and actions taken this far.  Marubeni made clear their position that the consortium should take immediate measures to terminate our agreement with [Consultant A], negotiate and settlement and engage a new representative to turn the situation around."

58.     On or about September 25, 2003, KUSUNOKI sent an e-mail to MOENAF, SULIANTO, Pierucci, Pomponi, and another Alstom employee, copying other employees from Marubeni, stating, "As you can understand, unfortunately our agent almost did not execute his function at all, so far.  In case we don't take immediate action now now, we don't have any chance to get this project forever.  We shall not wait for coming of decision maker any more.  Please direct your opinion to your Representative today."

59.     In or around late September 2003, KUSUNOKI, MOENAF, SULIANTO, Hoskins, Pierucci, and other employees of the Consortium told Consultant A at a meeting in Indonesia that: (i) they were going to retain another consultant to pay bribes to officials at PLN in connection with the Tarahan Project; (ii) Consultant A needed to pay bribes only to Official 1;

18

and (iii) Consultant A's commission, therefore, would be cut from three percent of the total value of the contract to one percent.

60.     On or about September 30, 2003, MOENAF sent an e-mail to Hoskins, stating, "Eko [SULIANTO] also informed me there has been discussion between Fred [Pierucci], Marubeni and [Consultant A] yesterday where [Consultant A] committed to convince [Official 1] that 'one' is enough."

61.     On or about October 1, 2003, KUSUNOKI sent a letter to Consultant B regarding the Tarahan Project, and stated, "With reference to our discussion regarding the captioned project, we are pleased to confirm the agreement between us. In the event that we are successful, we confirm that we will pay a total of two percent (2%) of the contract price (not including VAT) for our scope of work to you for the various services you are providing. The details of this agreement will be formalized in a Service Agreement."

62.     In or around October 2003, MOENAF, SULIANTO, Hoskins, Pierucci, and other employees of Alstom sent an amended consulting agreement to Consultant A in connection with the Tarahan Project reflecting the reduced commission rate of one percent.

63.     On or about October 8, 2003, Consultant A sent an e-mail to Pierucci stating, "The contract is basically fine. [Official 1] is trying to verify that in case he has to do horse trading with [another official], the expenses are not coming from my contract but he has not managed to talk to [Official 2] directly, in part because he does not want to address the issue directly....Finally, I have not been able to get a contract out of Marubeni even though they keep saying there is no problem. They also told [Official 2] that they do not have a firm commitment to me yet and that has not sat well with [Official 1]. So please give them a nodge. Hopefully we can sign both contracts at the same time."

19

64.     On or about October 13, 2003, Hoskins sent a letter to Consultant B regarding the Tarahan Project, and stated, "Further to our discussion on the above project last Saturday, I am pleased to confirm the agreement between us relating to the Tarahan project.  In the event that we are successful I confirm that Alstom will pay a total of 2% of the contract price for its scope of work (less fees and VAT) to you for the advisory and marketing service you are providing."

65.     On or about December 9, 2003, Marubeni and Consultant A entered into a consulting agreement in connection with the Tarahan Project reflecting a commission rate of one percent.

66.     On or about December 15, 2003, Hoskins sent a letter to Consultant B, stating, "Further to the recent meetings between us and subsequent discussions I am now pleased to confirm the arragments relating to the [Muara Tawar] project."

67.     On or about February 23, 2004, Pomponi sent an e-mail to KUSUNOKI, SULIANTO, and another Alstom employee, copying MOENAF, stating, "Understand that Mitsubishi has retained some lobbyist from the government (higher/more power than [another foreign official's] position to support their efforts on [the Tarahan Project].  Pls urgently check this out and have [Consultant B] re-evaluate our support to PLN."

68.     On or about March 3, 2004, MOENAF sent an e-mail to Hoskins, stating, "Last Monday we sent Tarahan CA [consultancy agreement] to [Consultant B], he immediately feel cornered after reading the ToP [terms of payment] which said 'prorata'.  When I talked to him on the phone I said that I will look at it and I thought it should not be that bad.  I then looked into Tarahan ToP (see attached) and realise that the project payment is spread over 3.5 year!  You would understand why he is worry, he is willing to pre-finance his scope, fulfilling his

commitment up-front (prior he get paid) to get the right 'influence', but certainly not waiting 2 to 3 years to get paid while most of his scope is completed in the beginning."

69.     On or about March 10, 2004, Pomponi sent an e-mail to Hoskins, Pierucci, and others, stating, "I have Reza [MOENAF] out in Indonesia negotiating the CA Terms with [Consultant B]. As you know, the Tarahan estimate can not tolerate such advance payments and I'm not sure how we can accommodate this."

70.     On or about March 18, 2004, Hoskins responded to the e-mail from Pomponi referenced in Paragraph 69 above, stating, "Not sure where we are with this but for your info [Consultant B] is also requesting tougher terms on other projects at the moment. I cannot comment on your cash flow but my advice in this instance is to go with the latest recommendation . . . [Consultant B] has a lot of work to do to support us in negotiation and he (and others) are slightly negative at the moment on Alstom support."

71.     On or about March 19, 2004, Consultant A sent an e-mail to Pierucci, stating, "I am back from Indonesia. I have mentioned the following to Bill [Pomponi]. But it is important that you also are aware of it. We need a very strong support from [Official 2] to counter Mitsubishi's lobbeying against us. I am not conviced that he is happy enough with us to provide the support. [Official 1] is also unhappy because he thinks Alstom has not firmly indicated its support for [Official 2]. Please verify that we have talked to [Official 2]."

72.     On or about March 20, 2004, Pierucci forwarded to MOENAF and Hoskins, copying Pomponi, the e-mail from Consultant A referenced in Paragraph 71 above, and stated, "See attached. Please check this again urgently with [Consultant B]."

73.     On or about March 22, 2004, MOENAF sent an e-mail to Pierucci, copying Hoskins and Pomponi, in response to the e-mail referenced in Paragraph 72 above, stating, "This

is a known situation and it is true that [Official 2] slowing down (no happy) in supporting Alstom. I have mentioned this in my earlier note to Lawrence [Hoskins]. But what would you expect with 2-3%, and 'prorate' ToP [terms of payment]. He shook his head when he heard that the ToP is spread in three and half year. Lets ask our self what have we done which showed our commitment to him? Talking! that is what he said to me. Be aware [Official 2's] reaction on Tarahan is impacting Alstom's other project [Muara Tawar] too."

74.     On or about March 22, 2004, Pomponi sent an e-mail to Hoskins, stating, "I have seen your response and wish to offer the following as our compromise to [Consultant B's] proposal: Instead of this could we suggest something like:

-40% at receipt by ALSTOM of the down payment

-Additional 40% at receipt by ALSTOM at month 12

-Additional 15% at receipt by ALSTOM at month 18

-Last 5% at the end of the contractual obligations

Pls advise if these you think would be acceptable?? What are your terms on Muara Tuar??"

75.     On or about March 22, 2004, Pomponi sent an e-mail to KUSUNOKI, copying Pierucci and another Marubeni employee, stating, "I am trying to get agreement with [Consultant B] but he's objecting strongly and asking for 'front-end' payments which affect our cash flow. I consider both you and I as having similar payment schemes for [Consultant B], therefore pls share with me your proposal and idea. Do you have agreement yet with [Consultant B] for your portion?? Pls consider this as an urgent request and respond at your most earliest convenience."

76.     On or about March 23, 2004, KUSUNOKI responded to the e-mail referenced in Paragraph 75 above, stating, "Regarding payment terms and conditions for [Consultant B], I have not yet discussed in detail with [Consultant B] during your absence from Indonesia...I think

some consistency of response to [Consultant B] shall be necessary to get their compromise and to finalize the issues."

77.     On or about March 30, 2004, Hoskins sent an e-mail to Pierucci and Pomponi, stating, "To clear up any confusion.  You proposed an 18 month schedule but it will not fly in Indonesia at this time.  In my discussion with Fred [Pierucci] and mails as per attached I recommended that we go with the latest proposal: 40/35/20/5.  Marubeni wait for us and will follow suit.  We are all agreed the terms are lousy but there is no choice.  Reza [MOENAF] sees [Official 2] tomorrow and needs to confirm this position.  Can you give him the all clear today?"

78.     On or about March 30, 2004, Pomponi sent an e-mail in response to the e-mail from Hoskins described in Paragraph 77 above, stating, "Approval has just come regarding the terms (40/35/20/5).  Yes, I agree they are lousy terms but as you and I talked last week, we both believe we have no choice.  I will send a separate message to Reza [MOENAF], Eko [SULIANTO], Kusunoki, and [another Marubeni employee] regarding the T/P to insure we get [Consultant B's] signature and follow-up action with our friends.  A note from you as well to Kusunoki and [the other Marubeni employee] would be helpful given [Marubeni's] thus far objections to such 'front-end' loading of payments."

79.     On or about March 30, 2004, Pomponi sent an e-mail to KUSUNOKI, copying MOENAF, Hoskins, Pierucci, and another Marubeni employee, stating, "As we discussed last week by telephone, [Consultant B] is requiring 95% payment within the first 12 months of the contract.  I stated that this was a problem for ALSTOM however after speaking with Reza Moenaf and Lawrence Hoskins, I am now convinced that this mode of payment is necessary for the continuation of [Consultant B's] effectiveness....As mentioned by you last week, [Marubeni] confirmed to follow ALSTOM's actions and conclusions for the [Consultant B] Agreement."

80.     On or about March 30, 2004, KUSUNOKI responded to the e-mail from Pomponi referenced in Paragraph 79 above, stating, "I understand.  We follow you.  I will try to finalize the agreement at earliest possible time."

81.     On or about March 30, 2004, Pomponi sent an e-mail to MOENAF, Hoskins, and Pierucci, stating, "Approval…has finally been received this morning authorizing the requested Terms of Payment.  Pls proceed with this ASAP to obtain the CA signing by [Consultant B] in order for [Consultant B's] effectiveness to continue."

82.     On or about March 31, 2004, MOENAF responded to the e-mail from Pomponi referenced in Paragraph 81 above, stating, "I will mentioned our position to [Official 2] and [Consultant B] this afternoon.  Furthermore I would suggest you to contact [the employee at Power Company Switzerland responsible for consultancy agreements] with a request to make the necessary CA changes (ToP) and ask her to send me the revised CA asap.  Once the revised agreement arrived I will obtain [Consultant B's] signature.  Mean while I will give [Official 2]/[Consultant B] my word."

83.     On or about April 5, 2004, MOENAF sent an e-mail to Hoskins, copying SULIANTO, Pierucci, and Alstom Employee A regarding the Tarahan Project and one of the Muara Tawar Projects, stating, "According to [Official 2] Alstom did not show enough its 'commitment' to PLN….[Official 2] also asked me whether for PLN Alstom could use one representative (agent), rather than 2 or 3.  According to [Official 2] in Labuan Angin [Consultant A] was involved.  [Official 2] thought he made to Fred [Pierucci] and you clear [Consultant A] was not the right person."

84.     On or about November 4, 2004, Alstom Employee A sent an e-mail to MOENAF, SULIANTO, and other Alstom employees regarding one of the Muara Tawar Projects, stating,

24

"[W]e need a person with PLN evaluation team loyal to us and attitude of a street fighter for our interest. [Muara Tawar Project] we have [Official 4] – he helped us in the Tarahan processing and helped us to get the deal....He needs to be convinced that he is fighting for the right cause. We need to do a sales job on him."

85.     On or about July 12, 2005, SULIANTO sent an e-mail to MOENAF, Alstom Employee A, and another Alstom employee regarding one of the Muara Tawar Projects, stating, "We have built relationship with [Official 4] since the Tarahan [] project.  In this [Muara Tawar Project], we were among those who promoted [Official 4] so that he can become a member of the [Muara Tawar Project] procurement team....Looking at this fact, [Official 4] is of critical importance to us as our vehicle....[Official 4] must be ensured that his effort will be worth his while....We need to set up additional CA [consultancy agreement], separate from the basic CA currently in place, to cover [Official 4] and his people, as our ammunition to approach working level which is currently untouched by our agent."

86.     On or about December 8, 2005, after the Consortium was awarded the Tarahan Project contract, Consultant A sent an e-mail to Pomponi, stating, "Good morning from Jakarta. [Official 4] keep contacting me and asking for ...support.  He has not been contacted by you or your local team.  Could you please give him a call and let him know I have nothing to do with him.  It is really important." (Ellipses in original).

87.     On or about December 9, 2005, Pomponi forwarded to MOENAF and SULIANTO, copying Pierucci, the e-mail from Consultant A referenced in Paragraph 86 above, and stated, "This has gone on way too long.  Please take care of this.  Please advise when this is completed and settled.  As you are fully aware, [Consultant A] has nothing to do with PLN. There was a complete and clear division of responsibility."

88.     On or about September 22, 2006, Alstom Employee A sent an e-mail to another Alstom employee with the subject, "Tarahan – commitment fell thru the cracks," stating, "One of the engineering chaps [Official 4] who had a lot of influence on the outcome of the Tarahan has not been fully compensated on the Tarahan project.  Now he is involved in [the Maura Tawar Project] and keeps reminding the boys that we owe him something.  This issue needs to be sorted out ASAP to ensure proper support on [the Muara Tawar Project].   According to Eko [SULIANTO], [Consultant B] has honored his pro rata portion of the commitment.  The original ('other') Agent did not.  I don't know if the other guy has received any consulting fees.  Would you be able to check that out with Prom?  If not then we should block the payments until he takes care of the guy."

### *Payments from Alstom to Consultant A to Bribe Official 1*

89.     On or about November 16, 2005, as a result of an agreement reached between co-conspirators and Consultant A, Alstom Power US in Windsor, Connecticut, caused a wire transfer in the amount of $200,064 from the company's bank account in New York to Consultant A's bank account in Maryland for the purpose of paying bribes to Official 1.

90.     On or about January 4, 2006, as a result of an agreement reached between co-conspirators and Consultant A, Alstom Power US in Windsor, Connecticut, caused a wire transfer in the amount of $200,064 from the company's bank account in New York to Consultant A's bank account in Maryland for the purpose of paying bribes to Official 1.

91.     On or about March 7, 2007, as a result of an agreement reached between co-conspirators and Consultant A, Alstom Power US in Windsor, Connecticut, caused a wire transfer in the amount of $200,064 from the company's bank account in New York to Consultant A's bank account in Maryland for the purpose of paying bribes to Official 1.

92.     On or about October 5, 2009, as a result of an agreement reached between co-conspirators and Consultant A, Alstom Power US in Windsor, Connecticut, caused a wire transfer in the amount of $66,688 from the company's bank account in New York to Consultant A's bank account in Maryland for the purpose of paying bribes to Official 1.

### *Payments from Marubeni to Consultant A to Bribe Official 1*

93.     On or about June 30, 2005, as a result of an agreement reached between co-conspirators and Consultant A, Marubeni caused a wire transfer in the amount of $151,781.70 from its bank account in New York to Consultant A's bank account in Maryland for the purpose of paying bribes to Official 1.

94.     On or about December 28, 2005, as a result of an agreement reached between co-conspirators and Consultant A, Marubeni caused a wire transfer in the amount of $154,462.30 from its bank account in New York to Consultant A's bank account in Maryland for the purpose of paying bribes to Official 1.

95.     On or about November 14, 2008, as a result of an agreement reached between co-conspirators and Consultant A, Marubeni caused a wire transfer in the amount of $51,549.79 from its bank account in New York to Consultant A's bank account in Maryland for the purpose of paying bribes to Official 1.

### *Payments from Alstom to Consultant B to Bribe Officials at PLN*

96.     On or about July 20, 2005, as a result of an agreement reached between co-conspirators and Consultant B, Alstom Power US in Windsor, Connecticut, caused a wire transfer in the amount of $418,906 from the company's bank account in New York to Alstom Prom's bank account in Zurich, Switzerland, which amount was transferred by Alstom Prom to Consultant B's bank account in Singapore for the purpose of paying bribes to officials at PLN.

97.     On or about July 26, 2005, as a result of an agreement reached between co-conspirators and Consultant B, Alstom Power US in Windsor, Connecticut, caused a wire transfer in the amount of $114,598 from the company's bank account in New York to Alstom Prom's bank account in Zurich, Switzerland, which amount was transferred by Alstom Prom to Consultant B's bank account in Singapore for the purpose of paying bribes to officials at PLN.

98.     On or about March 28, 2006, as a result of an agreement reached between co-conspirators and Consultant B, Alstom Power US in Windsor, Connecticut, caused a wire transfer in the amount of $466,816 from the company's bank account in New York to Alstom Prom's bank account in Zurich, Switzerland, which amount was transferred by Alstom Prom to Consultant B's bank account in Singapore for the purpose of paying bribes to officials at PLN.

99.     On or about December 6, 2006, as a result of an agreement reached between co-conspirators and Consultant B, Alstom Power US in Windsor, Connecticut, caused a wire transfer in the amount of $266,752 from the company's bank account in New York to Alstom Prom's bank account in Zurich, Switzerland, which amount was transferred by Alstom Prom to Consultant B's bank account in Singapore for the purpose of paying bribes to officials at PLN.

All in violation of Title 18, United States Code, Section 371.

<u>COUNTS TWO THROUGH FIVE</u>
(Foreign Corrupt Practices Act)

100.    Paragraphs 1 through 24 and 26 through 99 are realleged and incorporated by reference as though fully set forth herein.

101.    On or about the dates set forth below, in the District of Connecticut and elsewhere, KUSUNOKI, being an agent of a domestic concern, did willfully use and cause to be used, and did aid and abet the use of, the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the

28

payment of money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official, and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist the domestic concerns in obtaining and retaining business for and with, and directing business to, Consortium and others, as follows:

| COUNT | DATE | MEANS AND INSTRUMENTALITIES OF INTERSTATE AND INTERNATIONAL COMMERCE |
|-------|------|---------------------------------------------------------------------|
| Two | 11/16/2005 | Employees of Power Company Connecticut, while in Connecticut, caused a wire transfer in the amount of $200,064 from the company's bank account in New York to Consultant A's bank account in Maryland. |
| Three | 1/4/2006 | Employees of Power Company Connecticut, while in Connecticut, caused a wire transfer in the amount of $200,064 from the company's bank account in New York to Consultant A's bank account in Maryland. |
| Four | 3/28/2006 | Employees of Power Company Connecticut, while in Connecticut, caused a wire transfer in the amount of $466,816 from the company's bank account in New York to Power Company Switzerland's bank account in Zurich, Switzerland, which amount was transferred by Power Company Switzerland to Consultant B's bank account in Singapore. |

| COUNT | DATE | MEANS AND INSTRUMENTALITIES OF INTERSTATE AND INTERNATIONAL COMMERCE |
|-------|------|----------------------------------------------------------------------|
| Five | 12/6/2006 | Employees of Power Company Connecticut, while in Connecticut, caused a wire transfer in the amount of $266,752 from the company's bank account in New York to Power Company Switzerland's bank account in Zurich, Switzerland, which amount was transferred by Power Company Switzerland to Consultant B's bank account in Singapore. |

All in violation of Title 15, United States Code, Section 78dd-2, and Title 18, United States Code, Section 2.

## COUNTS SIX THROUGH SEVEN
### (Foreign Corrupt Practices Act)

102.   Paragraphs 1 through 24 and 26 through 99 are realleged and incorporated by reference as though fully set forth herein.

103.   On or about the dates set forth below, in the District of Connecticut and elsewhere, KUSUNOKI, MOENAF, and SULIANTO, being agents of a domestic concern, did willfully use and cause to be used, and did aid and abet the use of, the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official, and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his influence with a foreign government and agencies and instrumentalities thereof

30

to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist the domestic concerns in obtaining and retaining business for and with, and directing business to, Consortium and others, as follows:

| COUNT | DATE | MEANS AND INSTRUMENTALITIES OF INTERSTATE AND INTERNATIONAL COMMERCE |
|---|---|---|
| Six | 3/7/2007 | Employees of Power Company Connecticut, while in Connecticut, caused a wire transfer in the amount of $200,064 from the company's bank account in New York to Consultant A's bank account in Maryland. |
| Seven | 10/5/2009 | Employees of Power Company Connecticut, while in Connecticut, caused a wire transfer in the amount of $66,688 from the company's bank account in New York to Consultant A's bank account in Maryland. |

All in violation of Title 15, United States Code, Section 78dd-2, and Title 18, United States Code, Section 2.

COUNT EIGHT<br>(Conspiracy to Commit Money Laundering)

104.    Paragraphs 1 through 24 and 26 through 99 are realleged and incorporated by reference as though fully set forth herein.

105.    From in or around 2002, and continuing through in or around 2009, in the District of Connecticut and elsewhere, KUSUNOKI, MOENAF, and SULIANTO did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate and agree together and with each other, and with others known and unknown to the Grand Jury, to commit offenses under Title 18, United States Code, Sections 1956 and 1957, namely:

a.    to knowingly transport, transmit and transfer monetary instruments and funds from a place in the United States to and through a place outside the

United States, with the intent to promote the carrying on of a specified unlawful activity, namely, bribery of a foreign official, a felony violation of the FCPA, Title 15, United States Code, Section 78dd-2, in violation of Title 18, United States Code, Section 1956(a)(2)(A); and

b.   to engage in a monetary transaction by, through and to a financial institution, in and affecting interstate and foreign commerce, in criminally derived property that was of a value greater than $10,000.00, that is, the deposit, withdrawal, transfer and exchange of United States currency, funds and monetary instruments, such property having been derived from specified unlawful activity, namely, bribery of a foreign official, a felony violation of the FCPA, Title 15, United States Code, Section 78dd-2, in violation of Title 18, United States Code, Section 1957.

## Manner and Means of the Conspiracy

106.   The manner and means by which KUSUNOKI, MOENAF, SULIANTO, and their co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following, while in the District of Connecticut and elsewhere:

107.   KUSUNOKI, MOENAF, and SULIANTO, together with other co-conspirators, discussed in person, via telephone, and via e-mail the instructions for sending money to Consultant A's bank account in Maryland.

108.   KUSUNOKI, MOENAF, and SULIANTO, together with other co-conspirators, directed the wire transfer of, and caused to be wired, money from Alstom Power US's and Marubeni's bank accounts in New York to Consultant A's bank account in Maryland for the purpose of concealing and disguising the bribe payments to Official 1.

109.   Consultant A took a portion of the money paid to Consultant A's bank account in Maryland and engaged in monetary transactions designed to conceal the source of the moneys and the fact that they were bribes to Official 1.

32

110.     Consultant A took a portion of the money paid to Consultant A's bank account in Maryland and engaged in monetary transfers designed to promote the payment of bribes through international monetary transfers for the benefit of Official 1.

111.     Consultant A took a portion of the money paid to Consultant A's bank account in Maryland and engaged in monetary transactions of a value greater than $10,000 using criminally derived property.

112.     KUSUNOKI, MOENAF, and SULIANTO, together with other co-conspirators, directed the wire transfer of, and caused to be wired, money from Alstom Prom's and Marubeni's bank accounts to Consultant B's bank account for the purpose of concealing and disguising the bribe payments to foreign officials at PLN, including Official 2 and Official 3, among others.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNTS NINE THROUGH ELEVEN
### (Money Laundering)

113.     Paragraphs 1 through 24, 26 through 99, and 106 through 112 are realleged and incorporated by reference as though fully set forth herein.

114.     On or about the dates set forth below, in the District of Connecticut and elsewhere, KUSUNOKI did knowingly transport, transmit, and transfer, and aid, abet, and cause others to transport, transmit, and transfer, and attempt to transport, transmit, and transfer the following monetary instruments and funds from a place in the United States, namely Maryland, to a place outside the United States, namely Indonesia, intending that each of the transactions, in whole and in part, promote the carrying on of specified unlawful activity, that is, a felony

violation of the Foreign Corrupt Practices Act, Title 15, United States Code, Section 78dd-2, as follows:

| COUNT | DATE | MONETARY TRANSACTION |
|---|---|---|
| Nine | 12/14/2005 | Wire transfer in the amount of $100,000 from Consultant A's bank account in Maryland to a bank account in Indonesia for the purpose of paying Official 1 to promote the carrying on of the bribery scheme. |
| Ten | 3/1/2006 | Wire transfer in the amount of $100,000 from Consultant A's bank account in Maryland to a bank account in Indonesia for the purpose of paying Official 1 to promote the carrying on of the bribery scheme. |
| Eleven | 8/8/2006 | Wire transfer in the amount of $80,000 from Consultant A's bank account in Maryland to a bank account in Indonesia for the purpose of paying Official 1 to promote the carrying on of the bribery scheme. |

All in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 2.

## COUNT TWELVE
(Money Laundering)

115.    Paragraphs 1 through 24, 26 through 99, and 106 through 112 are realleged and incorporated by reference as though fully set forth herein.

116.    On or about March 9, 2007, in the District of Connecticut and elsewhere, KUSUNOKI, MOENAF, and SULIANTO did knowingly transport, transmit, and transfer, and aid, abet, and cause others to transport, transmit, and transfer, and attempt to transport, transmit, and transfer the following monetary instruments and funds from a place in the United States, namely Maryland, to a place outside the United States, namely Indonesia, intending that each of

34

the transactions, in whole and in part, promote the carrying on of specified unlawful activity, that is, a felony violation of the Foreign Corrupt Practices Act, Title 15, United States Code, Section 78dd-2, to wit, a wire transfer in the amount of $80,000 from Consultant A's bank account in Maryland to a bank account in Indonesia for the purpose of paying Official 1 to promote the carrying on of the bribery scheme.

All in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 2.

A TRUE BILL

/s/
FOREPERSON

MICHAEL J. GUSTAFSON
FIRST ASSISTANT U.S. ATTORNEY
DISTRICT OF CONNECTICUT

KATHLEEN MCGOVERN
SENIOR DEPUTY CHIEF, FRAUD SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

DAVID E. NOVICK
ASSISTANT U.S. ATTORNEY

DANIEL S. KAHN
ASSISTANT CHIEF

35